UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

COUNTY OF AMADOR, CALIFORNIA,

       Plaintiff,

  v.

THE UNITED STATES DEPARTMENT OF THE INTERIOR; DIRK KEMPTHORNE, SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR; CARL J. ARTMAN, ASSISTANT SECRETARY OF INDIAN AFFAIRS; and JAMES E. CASON, ASSOCIATE DEPUTY SECRETARY OF INDIAN AFFAIRS,

       Defendants.

NO. CIV. S-07-527 LKK/GGH

O R D E R

/

      Plaintiff Amador County has brought the present action challenging defendant U.S. Department of Interior's legal opinion that, if taken into trust by the federal government, a parcel of land in Amador County will be eligible for gaming operations. The Ione Band of Miwok Indians, who requested that the land be taken into federal trust, has intervened as a defendant. Pending before the court are two motions to dismiss, one filed by the federal

1

defendants and another by Ione, both of which argue that the Department of Interior's opinion is not final agency action under the Administrative Procedures Act and is thus unreviewable. As explained below, because the opinion will have no effect unless and until the federal government makes the decision to take the land into trust, the court grants the motions to dismiss.

## I. Background

Plaintiff Amador County has brought the present action against defendants U.S. Department of Interior ("Department" or "DOI"), Dirk Kempthorne, Secretary of the DOI, Carl Artman, Assistant Secretary of Indian Affairs, and James Cason, Associate Deputy Secretary of Indian Affairs. The county seeks to invalidate, under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* ("APA"), a legal opinion issued by the Department. Previously, on November 29, 2005, the Ione Band of Miwok Indians ("Ione" or "Ione Band") submitted an application to the Department -- which is still pending -- requesting that approximately 200 acres of land in Amador County, California (hereafter, "Plymouth Parcels") be taken into federal trust. The Ione Band seeks to construct and operate a Class III gaming facility on the property.[1] In a September 19, 2006 opinion memorandum, the Department opined that gaming could be conducted on the land, if taken into trust, because it would qualify as Indian lands upon which gaming may be conducted under the Indian Gaming Regulatory Act ("IGRA"). Amador County now

---

[1] Class III gaming includes casino games, such as slot machines, roulette, poker, and blackjack. 25 U.S.C. § 2703(8).

2

challenges that legal opinion on the grounds that it was substantively wrong and that the Department failed to comply with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA").

**A. Legal Background**

The Indian Reorganization Act ("IRA") was enacted in 1934 as part of the federal government's return to a policy supporting "principles of tribal self-determination and self-governance." County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation, 502 U.S. 251, 255 (1992). Under Section 5 of the IRA, the DOI Secretary has general discretionary authority to take land into trust for the benefit of Indian tribes. 25 U.S.C. §§ 465 & 467. The pertinent regulations provide that tribal "fee-to-trust" applications must include, among other things, information about the tribe's need for additional land, the purposes for which the land will be used, and the extent to which the tribe has provided information that will allow the Secretary to comply with obligations under NEPA. 25 C.F.R. § 151.11.

Here, the Ione Band seeks to develop a casino resort on the Plymouth Parcels. The Indian Gaming Regulatory Act ("IGRA") regulates gaming on Indian lands and restricts the lands upon which Indian tribes may conduct gaming. Whereas the decision to take land into trust for tribes pursuant to the IRA is made by DOI, the regulation of gaming pursuant to the IGRA falls upon the National Indian Gaming Commission ("NIGC") (which is only nominally part of the DOI). See 25 U.S.C. §§ 2704-08; Kansas v. United States, 249

F.3d 1213, 1218 n.1 (10th Cir. 2001).

Under the IGRA, tribes may only operate gaming on "Indian lands," which consist of (1) "lands within the limits of any Indian reservation" and (2) "lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe or . . . held by any Indian tribe . . . subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. §§ 2703(4)(A) and (B). It is this second part, addressing land held in trust, that applies to this case.

Tribes that had reservations or trust land prior to IGRA's enactment on October 17, 1988 are permitted to operate gaming on their land. Tribes like Ione, however, who did not have land held in trust on their behalf prior to October 17, 1988 must satisfy any one of several conditions, listed at 25 U.S.C. § 2719 (Section 20 of IGRA), before they can conduct gaming.

Two of these Section 20 conditions are potentially applicable here. First, gaming is permitted on land acquired after 1988 if "the lands are taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B). The Ione Band contends that the Plymouth Parcels fall under this provision. Accordingly, in order for Ione to operate gaming, it must be a "restored tribe" and the land at issue must be taken into trust by the federal government as part of a "restoration of [Ione's] lands." Id.

Second, if one of the express exceptions such as restored

4

1  lands does not apply, the IGRA also contains a catch-all provision:
2  gaming is permitted if the tribe complies with a two-part process
3  in which the Secretary of the Department and Governor of the State
4  in which gaming is sought both conclude, after broad consultation
5  with affected interests (including local governments such as Amador
6  County), that gaming would be "in the best interest of the Indian
7  tribe and its members, and would not be detrimental to the
8  surrounding community."  25 U.S.C. § 2719(a) & (b)(1)(A).  It is
9  this two-part consultation provision, rather than the restored
10 lands exception, that Amador County contends should govern whether
11 gaming is permitted on the Plymouth Parcels.

**B. Factual Background**

On September 20, 2004, Ione submitted a request to NIGC for an opinion on whether gaming would be permitted on the Plymouth Parcels under the IGRA.  Pursuant to a Memorandum of Agreement ("MOA") executed between NIGC and DOI in 2006, DOI reviewed the request.  While NIGC regulates gaming, DOI analyzed whether gaming would be permissible on the land, because, under regulations implementing Section 5 of the IRA, DOI must take into account the purpose for which the land will be used.  25 C.F.R. § 151.11.  This is not to suggest, however, that DOI's analysis is subsequently binding upon NIGC.[2]

---

[2] While at least one Section 20 IGRA determination -- whether land is a "reservation" -- has been delegated to DOI, there is no indication that the "restored lands" determination has been delegated to DOI, as opposed to NIGC.  See 2002 Dep't of the Interior and Related Agencies Appropriations Act, Pub. L. No. 107-63, 115 Stat. 414, 442-43 (2001) (clarifying that "[t]he authority

5

1    On September 19, 2006, DOI Assistant Secretary of Indian
2 Affairs Carl Artman issued a memorandum expressing his opinion
3 that, as a legal matter, the lands at issue would qualify as
4 "restored lands" for a "tribe that is restored to Federal
5 recognition" if and when they are taken into trust.  DOI Associate
6 Deputy Secretary of Indian Affairs James Cason concurred in that
7 opinion on September 26, 2006.  Amador County maintains that the
8 "Artman/Cason opinion" constitutes final agency action.

9    The legal opinion regarding land status is only one of several
10 issues that the Secretary takes into consideration when deciding
11 whether to take land into trust for gaming purposes.  In DOI's
12 "Checklist for Gaming Acquisitions, Gaming-Related Acquisitions,
13 and IGRA Section 20 Determinations," for example, obtaining a legal
14 opinion from the Solicitor's Office of DOI is one step, but there
15 are also others, such as preparing environmental documents to
16 facilitate compliance with NEPA. As noted earlier, the application
17 for DOI to take the Plymouth Parcels into trust for Ione is still
18 pending.

### II. Standard

20    In order to survive a motion to dismiss for failure to state
21 a claim, plaintiffs must allege "enough facts to state a claim to
22 relief that is plausible on its face."  <u>Bell Atlantic Corp. v.</u>

---

to determine whether a specific area of land is a 'reservation' . . . was delegated to the Secretary of the Interior" by IGRA); <u>Casinos Exposing Truth About Casinos v. Kempthorne</u>, 492 F.3d 460, 469 (D.C. Cir. 2007); <u>Michigan Gambling Opposition v. Norton</u>, 477 F. Supp. 2d 1, 8 (D.D.C. 2007).

6

1  Twombly, -- U.S. --, 127 S. Ct. 1955, 1974 (2007).  While a
2  complaint need not plead "detailed factual allegations," the
3  factual allegations it does include "must be enough to raise a
4  right to relief above the speculative level."  Id. at 1964-65.
5       Federal Rule of Civil Procedure 8(a)(2) requires a "showing"
6  that the plaintiff is entitled to relief, "rather than a blanket
7  assertion" of entitlement to relief.  Id. at 1965 n.3.  Though such
8  assertions may provide a defendant with the requisite "fair notice"
9  of the nature of a claim, only factual allegations can clarify the
10 "grounds" upon which that claim rests.  Id.  "The pleading must
11 contain something more. . . than . . . a statement of facts that
12 merely creates a suspicion [of] a legally cognizable right of
13 action."  Id. at 1965, quoting 5 C. Wright & A. Miller, Federal
14 Practice and Procedure, § 1216, pp. 235-36 (3d ed. 2004).
15      On a motion to dismiss, the allegations of the complaint must
16 be accepted as true.  See Cruz v. Beto, 405 U.S. 319, 322 (1972).
17 The court is bound to give the plaintiff the benefit of every
18 reasonable inference to be drawn from the "well-pleaded"
19 allegations of the complaint.  See Retail Clerks Intern. Ass'n,
20 Local 1625, AFL-CIO v. Schermerhorn, 373 U.S. 746, 753 n.6 (1963).
21 In general, the complaint is construed favorably to the pleader.
22 See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other
23 grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982).
24 Nevertheless, the court does not accept as true unreasonable
25 inferences or conclusory legal allegations cast in the form of
26 factual allegations.  W. Mining Council v. Watt, 643 F.2d 618, 624

(9th Cir. 1981).

## III. Analysis

**A. Final Agency Action under the APA**

The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Where, as here, no other statute provides a private right of action, the "agency action" complained of must be "final agency action." 5 U.S.C. § 704. Two criteria must be satisfied in order for agency action to be final: (1) "the action must mark the 'consummation' of the agency's decision-making process -- it must not be of a merely tentative or interlocutory nature" and (2) "the action must be one by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal citations omitted).

The core question is whether the agency has completed its decision-making process, and whether the result directly affects the parties. Indus. Customers of NW Utils. v. Bonneville Power Admin., 408 F.3d 638, 646 (9th Cir. 2005). Agency action is final if it "amounts to a definite statement of the agency's position," "has a direct and immediate effect on the day-to-day operations of the subject party," or requires "immediate compliance." Oregon Natural Desert Ass'n v. United States Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006) (internal quotes omitted). The court must focus on the practical and legal effects of the agency action and interpret the finality element in a pragmatic and flexible manner.

1 Id.

2 Here, in short, final agency action is lacking for the simple reason that the trust application has yet to be approved. Even if, as appears to be the case, DOI has reached its final decision with respect to whether gaming is permissible on the Plymouth Parcels under the IGRA, that decision has no effect upon the parties unless the decision is first made to take the Plymouth Parcels into federal trust. In other words, the legally relevant question is not whether DOI has taken final action with respect to some intermediate step of Ione's trust application, but, rather, whether it has taken final action with respect to the trust application itself.

**1. Consummation of Agency Action**

The Artman/Cason opinion fails to satisfy either prong of Bennett. With regard to the first prong, Amador County argues that agency action is complete, because the gaming determination (under Section 20 of IGRA) and the trust decision are two separate and distinct actions. The county argues that the absence of finality with respect to the trust decision does not change the fact that the gaming determination is complete. As support, it notes that the trust decision and gaming determination are governed by two different statutes (IRA v. IGRA),[3] that there is no requirement

---

[3] See also *Oversight Hearing Before the Senate Committee on Indian Affairs Concerning Taking Land Into Trust*, 109th Cong. 3 (2005) (Testimony of George T. Skibine, Acting Deputy Ass't Secretary-Indian Affairs For Pol'y & Econ. Devel., Dep't of the Interior, May 18, 2005) ("Section 20 of IGRA does not provide authority to take land into trust for Indian tribes. Rather, it

9

that the two actions be made simultaneously, and that land may be taken into trust for purposes other than gaming. I cannot agree.

Amador County's version is only half the story. Taking land into trust without making a gaming determination may be reviewable (because it has independent effect); but making a gaming determination without subsequently taking land into trust is not. In other words, Amador County has merely shown that trust decisions are always reviewable, regardless of whether the land is taken into trust for gaming or some other purpose, and regardless of whether the gaming determination has been decided. But it has not shown the reverse: that gaming determinations are always reviewable, even prior to the trust decision.

In Central New York Fair Business Ass'n v. Kempthorne, the plaintiffs argued that DOI regulations exceeded statutory authority for taking land into trust, but the court dismissed the action because, as here, "the Secretary has not made a decision on the applications for trust status."[4] No. 06-CV-1501, 2007 WL 1593727, at *4 (N.D.N.Y. Jun. 1, 2007). Where there is a condition precedent that has yet to be satisfied before an agency's action

---

is a separate and independent requirement to be considered before gaming activities can be conducted on land taken into trust after October 17, 1988, the date IGRA was enacted into law.").

[4] It is arguable that regulations themselves constitute final agency action, since they "amount[] to a definite statement of the agency's position," "have the status of law" and may require "immediate compliance," Oregon Natural Desert Ass'n, 465 F.3d at 982, 987. Here, however, the Artman/Cason opinion does not require compliance or have any practical effect unless the decision is made to take the land into trust.

10

will have practical or legal effect, agency action has not yet consummated. See City of San Diego v. Whitman, 242 F.3d 1097, 1101 (9th Cir. 2001) (no final agency action where city had not yet filed an application for renewal of a permit, even though EPA had opined on how it would deal with the application); Top Choice Distribs., Inc. v. U.S. Postal Serv., 138 F.3d 463, 467 (2d Cir. 1998) (no final agency action where an administrative complaint had been filed but had not yet been resolved).

The cases relied upon by Amador County are not to the contrary. In Kansas, 249 F.3d at 1213, the Tenth Circuit held that NIGC's determination that a particular parcel of land qualified as "Indian lands" under the IGRA was final agency action. The land at issue there, however, was not land that had to be first taken into trust before gaming would be allowed.[5] The IGRA defines "Indian lands" to include (1) reservation land, (2) land held in federal trust, and (3) land held by an Indian tribe subject to restriction against alienation and over which the tribe exercises governmental power. 25 U.S.C. §§ 2703(4). The land at issue in Kansas was of the third variety. Accordingly, there, the major obstacle to gaming was the "Indian lands" determination,[6] whereas

---

[5] In addition, NIGC's actions in that case were deemed "final agency action" by IGRA's express terms. 25 U.S.C. § 2714.

[6] Indeed, even the gaming management contract had been approved by NIGC, although final agency action was probably achieved prior to this point. Kansas, 249 F.3d at 1223 ("The NIGC's [Indian lands] determination . . . inevitably will lead to Indian gaming on the tract. The Tribe made its intentions to establish . . . gaming on the tract unequivocally clear. Indeed, the NIGC has approved the Tribe's Class II gaming management

11

here, the extra hurdle of taking the Plymouth Parcels into trust exists.

Similarly, in United Keetoowah Band v. Oklahoma, No. CV-04-340, slip op. (E.D. Okla. Jan. 26, 2006), NIGC issued a letter finding that the lands at issue were not "Indian lands," and the court found that there were no additional steps to be taken before that became the agency's final opinion. Although the federal government argued that the letter had not been sent to the NIGC Chairman or entire Commission for "final" determination, the court noted that NIGC had treated it as final by ceasing to regulate the band's gaming operations and threatening to pursue criminal sanctions. Accordingly, the letter reflected the agency's settled position that gaming was impermissible on the land at issue. Here, by contrast, the permissibility of gaming turns on not only the Artman/Cason opinion but also on the DOI's decision to first take the Plymouth Parcels into trust. If and when DOI approves the trust application, final agency action will exist, and the county will be able to sue.

While the federal defendants and Ione Band argue that this court's present holding (that agency action has not yet consummated) is mandated by Miami Tribe of Oklahoma v. United States, No. 05-3085, 2006 WL 2392194 (10th Cir. Aug. 21, 2006), and Citizens Against Casino Gambling in Erie County v. Kempthorne, 471 F. Supp. 2d 295 (W.D.N.Y. 2007), these cases relied on a

---

contract.").

12

fundamentally different rationale than the one employed by the court today. In Miami Tribe, the Tenth Circuit evaluated a DOI opinion letter made pursuant to the NIGC and DOI 2006 Memorandum of Agreement. 2006 WL 2392194 at *4. The court held that the DOI opinion was not final agency action because it was merely advice to NIGC, who retained the final say-so on the relevant legal question (approval of management gaming contracts) and could therefore reject the DOI opinion. Id. The other case, Citizens Against Casino Gambling, adopted Miami Tribe's reasoning in dismissing a challenge to a DOI opinion letter. 471 F. Supp. 2d at 322, 327-28.

Here, however, it is DOI who retains the final say-so on the relevant legal question -- whether, for purposes of the fee-to-trust application, the Plymouth Parcels would constitute the restored lands of a restored tribe if taken into trust. Indeed, the federal defendants maintain that it is DOI, rather than NIGC, who bears ultimate responsibility in deciding whether the restored lands exception applies in the context of a trust application.[7] See 2006 Memorandum of Agreement ¶ 1 ("The NIGC agrees that whether a tribe meets one of the exceptions [e.g., restored lands] . . . is a decision made by the Secretary when he or she decides to take land into trust for gaming."). Accordingly, unlike Miami Tribe and Citizens Against Casino Gambling, the Artman/Cason opinion is not

---

[7] As noted earlier, however, outside the context of the trust application, NIGC retains the authority for determining whether the restored lands exception applies.

13

merely advice to the agency charged with making the relevant decision; it is the decision itself. Nevertheless, agency action has not yet consummated because, as discussed earlier, DOI has not approved the application.

**2. Determination of Rights or Obligations**

Even if plaintiff could satisfy the first prong of Bennett, it would also fail the second prong, which requires that the agency action determine rights or obligations. Bennett, 520 U.S. at 178. Because the Artman/Cason opinion decided that the restored lands exception applies, 25 U.S.C. § 2719(b)(1)(B), the county creatively argues that the memorandum rendered obsolete the catch-all provision, 25 U.S.C. § 2719(a) & (b)(1)(A), which would have otherwise provided for consultation with affected interests, such as local governments. Accordingly, in the county's view, the memorandum "fix[es] [a] legal relationship" and thereby constitutes final agency action. Oregon Natural Desert Ass'n, 465 F.3d at 987.

The problem with this position is that the underlying right to which the county claims ownership -- that of consultation -- only adheres if land is first taken into trust and if no other condition for gaming exists. The Artman/Cason opinion may show the latter (that no other condition for gaming exists[8]) but it did not

---

[8] Even this proposition is not completely certain. The IGRA permits gaming if any one of various Section 20 conditions are satisfied. As a technical matter, the existence of one condition (e.g., restored lands) does not preclude the existence of another condition (e.g., gaming deemed non-detrimental after consultation). As a practical matter, however, it would be duplicative for the agency to undertake the two-part consultation if the authority for gaming could be found elsewhere. The Artman/Cason opinion also

14

accomplish the former (decide to take the Plymouth Parcels into trust). Without deciding to take the Plymouth Parcels into trust, the Artman/Cason opinion has merely rearranged the parties' rights in a hypothetical world that may never come to fruition.

**B. Adequacy of Remedies**

Amador County also argues that if the present action is dismissed, it will have "no other adequate remedy in a court." 5 U.S.C. § 704. It maintains that any future lawsuit will be constrained by two limitations. First, DOI only needs to give notice 30 days prior to taking land into trust in a newspaper of general circulation serving the affected area or in the Federal Register.[9] 25 C.F.R. § 151.12(b). Second, the county worries that a future court might rule that the Quiet Title Act, 28 U.S.C. § 2409a, entirely precludes suit to the extent a plaintiff seeks to nullify an Indian trust acquisition.[10] See Dep't of Interior v. South Dakota, 519 U.S. 919, 922 (1996) ("The Government concedes only that, *if* the Secretary chooses to announce his acquisition decision *before* the acquisition becomes effective . . . judicial

---

expressly stated that because the restored lands exception applied, "the Band may conduct gaming on it without obtaining a two-part determination."

[9] Worse still, in the county's eyes, is that this 30-day window for judicial review is created entirely by DOI's regulations, which may be waived "'where the Secretary finds that [it] would be in the best interest of the Indians.'" See City of Shakopee v. United States, 197 U.S. Dist. LEXIS 2202, *17-*18 (D. Minn. Feb. 6, 1997).

[10] The court passes no judgment on the merits of this issue, upon which even the Ione Band and federal defendants appear to disagree.

15

review is available.") (Scalia, J., dissenting) (emphasis in original).

Accordingly, the county maintains that these twin forces -- requiring suit to be filed in 30 days and an injunction obtained in the same amount of time -- place it in a difficult position. Here, however, the federal defendants have essentially stated that they will not waive the 30 day notice requirement, and that they will self-stay acquisition of the land until any legal challenge has been resolved. Defs.' Reply at 7 ("There is no merit to the assertion . . . that Interior might waive its regulation in this context."); id. ("[T]he general policy of the Interior Department is to self-stay acquisition of tribal land into trust until challenges to acquisition decisions have been reviewed by courts."). Given the federal defendants' representations on this issue, the county's fears are unlikely to materialize.

### III. Conclusion

For the reasons explained above, the federal defendants' and Ione Band's motions to dismiss (Doc. Nos. 28 & 32) are GRANTED. The clerks' office is directed to close the case.

IT IS SO ORDERED.

DATED: December 12, 2007.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

16